UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CRAIG C. ANDREWS, ET AL. | CIVIL ACTION |
| V. | NO. 16-14842 |
| LOMAR CORP. LTD., ET AL. | SECTION F |

ORDER AND REASONS

Before the Court is a motion for summary judgment and motion to exclude Dr. Bourgeois's medical causation opinion, filed by defendants MS Maine Trader GMBH & Co. and Lomar Shipping LTD. For the reasons that follow, the motion is GRANTED.

**Background**

This litigation arises out of a Mississippi River pilot's allegations that he suffered a career-ending hip injury climbing an unsafe ladder while boarding the MARINE TRADER to take over piloting duties.

Craig C. Andrews worked as a river pilot from 1990 until he retired in June or July 2016. Throughout his 25 year career, he regularly climbed ladders to board thousands of ships.

In 2009, Dr. Chad Millet performed bilateral hip replacements on Mr. Andrews.[1] Mr. Andrews continued working as a full-time pilot with his artificial hips. When Dr. Millet saw Mr. Andrews on August 24, 2010, x-rays showed that the acetabular component of the left hip replacement (the socket portion made up of a metal shell and a polyethylene liner) had some verticality to it. Dr. Millet was concerned about possible polyethylene wear. If the polyethylene liner wears, Dr. Millet has opined, this can cause metal rubbing on metal, which can lead to a fracture of the acetabular component.

Sometime in December 2015, Mr. Andrews called to schedule an appointment with Dr. Millett; the appointment was scheduled for January 28, 2016. Four days before his pre-scheduled appointment with Dr. Millet, on January 24, 2016, Mr. Andrews was assigned to pilot the M/V TRADER in Pilottown, Louisiana in Plaquemines Parish to the Port of New Orleans. Mr. Andrews boarded the MAINE TRADER midstream using an industry-standard combination ladder, which employed both a pilot ladder (also known as a Jacob's ladder) and the ship's accommodation ladder. He stepped from the pilot boat

---

[1] Mr. Andrews first saw Dr. Millet, a board-certified orthopedist, in late 2008 for avascular necrosis of the right hip. He had successful right hip replacement surgery in January 2009. He then underwent left hip replacement surgery in September 2009 to address the avascular necrosis he developed in his left hip.

onto the ship's pilot ladder and started climbing up. As he climbed up the pilot ladder, he reached a point where he had to transition from the top of the pilot ladder onto the ship's accommodation ladder by stepping with his right foot onto the accommodation ladder's lower platform. After he stepped onto the accommodation ladder platform and started walking up the steps of the accommodation ladder, he says he heard clicking in his left hip.[2] He did not feel any pain at that time. Nor did he complain to the ship's crew. He never requested that an accident report be completed. Instead, he continued working without complaint.

Mr. Andrews safely piloted the vessel for seven hours before he left the ship by climbing down the same combination ladder midstream at Poydras. Mr. Andrews did not seek medical treatment when he left the ship. But four days later, he did go to his previously-scheduled January 28, 2016 appointment with Dr. Millet. On the sign-in sheet for his January 28 appointment with Dr. Millet, Mr. Andrews indicated that his visit was not the result of

---

[2] As described in the state court petition: Mr. Andrews had to maneuver through the hole in the platform and then continue up the side of the vessel using an accommodation ladder or gangway. As he climbed from the top rung of the pilot ladder through the hole in the platform, he was forced to reach out his right foot and make an extended reach/split from the ladder to the side of the platform, which he alleges created abnormal stress on his left hip. Mr. Andrews alleges that his hip then felt "loose" and that his hip "clicked."

3

an injury, it was not work-related, and that his symptoms had begun two months earlier. When he saw Dr. Millet, Mr. Andrews complained of clicking and triggering in his left hip, which he stated had begun gradually, without injury, about two months earlier.[3] Mr. Andrews did not advise Dr. Millet that the onset of his symptoms had occurred while boarding a ship earlier that week.[4]

Left hip x-rays taken on January 28, 2016 show significant wear of the polyethylene liner with some superior migration of the head and some subluxation (in layman's terms, the head was not located in the middle of the socket). As a result, almost one month later on February 24, 2016, Dr. Millet performed left hip revision surgery, which involved replacing the socket and ball in the left hip. During the surgery, Dr. Millet observed that the superior portion of the polyethylene liner was fractured; such a fracture could be caused by a high-impact injury, or steady wear over time. Dr. Millet could not tell what caused the fracture by observing it during the surgery, but Dr. Millet has opined that he believes that the fracture caused Mr. Andrews's left hip clicking

---

[3] The chart note dated February 2, 2016 states: "The patient is a 55 year old male who presents with complaints of painful clicking or triggering in the left hip that occurs intermittently. The onset was gradual without injury about two months ago."
[4] Dr. Millet testified that, if Mr. Andrews had attributed his hip issue to a specific event, he would have documented that in his notes.

and pain that Mr. Andrews had told him had begun two months before his late January 2016 appointment.

Dr. Millet saw Mr. Andrews twice more in 2016: on March 22 and on May 24. When Mr. Andrews again completed a sign-in sheet for the May 24 visit, he stated on that form (again) that his visit was not due to an injury and was not work-related. Dr. Millet made no determination as to Mr. Andrews's physical limitations or whether he could resume work.

To determine if he could be released back to work after his hip revision surgery, Mr. Andrews had an appointment on March 25, 2016 with Dr. Bourgeois, who was trained in general surgery and currently practices occupational medicine and dive medicine. Dr. Bourgeois did not believe that Mr. Andrews could return to work at that time. A few weeks later on April 13, 2016, Dr. Bourgeois completed a disability packet for Sun Life Assurance Company of Canada, Mr. Andrews's disability insurer, stating that Mr. Andrews was permanently disabled from working in his previous position as a river pilot. Dr. Bourgeois sent a letter to the insurance company the next day, stating that Mr. Andrews is not fit for duty as a river pilot and that this status is "more likely than not"

permanent.[5]  Nine days later, however -- when Mr. Andrews returned to see Dr. Bourgeois on April 22, 2016 to undergo a Coast Guard physical examination -- Dr. Bourgeois declared to the Coast Guard that Mr. Andrews "passed all aspects of the USCG physical requirements."  That same day, Dr. Bourgeois declared that Mr. Andrews passed all aspects of a functional capacity evaluation with no restrictions.  Dr. Bourgeois has not seen Mr. Andrews since April 22, 2016.  A couple months later, Mr. Andrews retired from river piloting.

On August 22, 2016, Mr. Andrews and his wife, Beverly R. Andrews, sued Lomar Corp. Ltd., Lomar Shipping Ltd., and Hapag-Lloyd, AG in state court, seeking to recover damages for his allegedly career-ending hip injury.  The plaintiffs allege that the pilot ladder of the MAINE TRADER was rigged in violation of federal laws and regulations; the defendants were negligent in rigging the ladder in violation of safety standards; the defendants negligently failed to warn him of the ladder's unsafe condition; and the MAINE TRADER was unseaworthy.  Mr. Andrews seeks to recover damages for his loss of wages, disability, disfigurement, and future pain and suffering, and his wife seeks to recover for loss of consortium.  Invoking the Court's diversity jurisdiction, the

---

[5] Dr. Bourgeois's opinions were based on his examination of Mr. Andrews on March 25, 2016 and his review of Dr. Millet's records.

case was removed to this Court. On September 29, 2016, the plaintiffs amended the complaint to name the correct entities as defendants, MS MAINE TRADER GMBH & Co. (as owner of the MAINE TRADER) and Lomar Shipping LTD. and, thereafter, moved for and was granted dismissal of Hapag-Lloyd AG.

On January 24, 2017, Mr. Andrews saw Dr. Millet, who opined that Mr. Andrews was "doing fine with his hip" such that he could resume the same activities he was able to do after his first hip replacement surgery.

Dr. Kevin Watson, an orthopedist, performed an independent medical examination of Mr. Andrews at the defendants' request on January 26, 2017. Dr. Watson has opined that Mr. Andrews's left hip revision surgery was due to significant polyethylene wear "that is not related to any injury at work...I do not see medical causation for his left hip problem due to work injury."

Dr. Millet's deposition was taken on February 22, 2017. Like Dr. Watson, Dr. Millet testified that the left revision surgery he performed was necessary due to polyethylene wear rather than a specific accident. Dr. Millet has stated that he expected that Mr. Andrews would need a revision surgery following his 2009 hip replacements because he was young when he had his hips replaced, he was active, and he was overweight. That Mr. Andrews was

overweight, combined with the verticality of the acetabular component in the left hip to accelerate wear, Dr. Millet has opined, the seven-year period between the left hip replacement surgery and the revision surgery was within the time range he would expect to see. Dr. Millet has specifically testified that he cannot causally relate Mr. Andrews's left hip revision to the alleged incident boarding the MAINE TRADER on January 24, 2016.[6]

During his deposition on March 7, 2017, Dr. Bourgeois admitted that he is not familiar with Mr. Andrews's condition before he climbed the ladder and, therefore, he has no opinion on whether climbing the ship's ladder necessitated Mr. Andrews's left hip revision surgery. Dr. Bourgeois admitted that because Dr. Millet performed the left hip revision surgery, he is in a better position to render an opinion on medical causation, and Dr. Bourgeois deferred to Dr. Millet on the medical causation issue.

---

[6] As to whether the condition he observed on Mr. Andrews's pre-revision surgery x-ray could be "the result of an acute, one-time type of event," Dr. Millet stated "It's unusual, but I've seen it happen before." When asked whether it was more probable than not in Mr. Andrews's case that it was not the result of a single incident, Dr. Millet answered: "That's hard to answer. I would say more likely than not [the significant wear of the polyethylene liner] was from repetitive wear, but this may be something where it's worn down, and one episode can fracture it, and, you know, in my eyes, that seems a little more likely." Asked again later what caused the need for hip revision surgery, Dr. Millet responded "I think it was more the polyethylene wear."

Dr. Bourgeois testified:

> Q. Do you have any opinions in this case about medical causation, in other words, what caused his hip to be in the condition it was when you saw him in March and April 2016?
>
> A. I don't have enough information to do that.
>
> Q. Would you defer to Dr. Millet on the issue of medical causation considering that Dr. Millet has treated Mr. Andrews since 2009, saw him both before and after the revision surgery in 2016?
>
> A. Yes.

Counsel for plaintiff then gave Dr. Bourgeois a scenario [about a person ascending a ladder through a "platform like a trap door" and "turning to the right extending his left leg and then transferring the weight"]:

> Q. And that type of motion could cause that hip to break and to damage that collar?
>
> A. I think it could.
>
> Q. And then upon walking immediately thereafter, the individual heard a clicking or felt a clicking in his hip. That would be a consistent thing if that would have occurred?
>
> A. I would say so. Yes.

When defense counsel re-examined Dr. Bourgeois:

> Q. You were given a scenario by counsel...but in this particular case you don't have an opinion on medical causation as to whether this climbing of the ladder had anything to do with the need for the revision surgery, correct?

A. That's correct. I don't have that knowledge.

Q. Because you don't know what his condition was before he climbed that ladder?

A. Correct. I didn't see him immediately after he climbed the ladder or, let's say, prior to his second revision. So I don't know what scenario happened.

...

Q. [Y]ou would defer to [Dr. Millet] on medical causation?

A. Yes.

Almost three weeks after giving his deposition, Dr. Bourgeois wrote a letter to Mr. Andrews's counsel. In this March 24, 2017 "report," as plaintiff characterizes it, Dr. Bourgeois opined that climbing the pilot ladder "could have" injured Mr. Andrews's left hip. He states:

> At your request I have reviewed that (sic) depositions of Dr. Chad Millet, Mr. Craig Andrews, and the photographs submitted of the worksite in question. The fracture of the acetabular component of Mr. Andrew's artificial hip was noted to involve the superior portion of the 'socket' by Dr. Millet. Mr. Andrew's left leg position as noted in the photograph showed full extension and a requirement for him to push off with this leg to complete the step up and onto the platform. This mechanism provided significant force and axial loading of the hip arthroplasty that could have resulted in fracture of the antero-superior aspect of the 'socket' of the left hip arthroplasty. This type of difficult and compromised physical position and demand speaks to the reason why I have not cleared him to return to full duty as a Mississippi River pilot. This also coincides with Mr. Andrews' testimony regarding the onset of clicking in the left hip that eventually prompted his return to Dr. Millet.

The defendants now move for summary judgment dismissing the plaintiffs' claims on the ground that medical causation cannot be proved; the defendants simultaneously move to exclude Dr. Bourgeois's recent medical causation opinion.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or

11

depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)(internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Id. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of

contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

II.

*A.*

The parties agree that an essential element of Mr. Andrews's negligence and unseaworthiness claims against the defendants is medical causation. The defendants submit that they are entitled to judgment as a matter of law because the plaintiff has no evidence that his left hip injury was, more probably than not, caused when he boarded the MAINE TRADER on January 24, 2016. The plaintiffs counter that Dr. Bourgeois's "expert report" (presumably the unsworn letter dated March 24, 2017 that post-dates Dr. Bourgeois's sworn deposition) creates a genuine dispute as to whether or not Mr. Andrews was injured climbing the combination ladder on the MAINE TRADER because Dr. Bourgeois states that the climbing maneuver "could have" resulted in fracture of his hip replacement hardware. The defendants urge the Court to exclude Dr. Bourgeois's opinion that Mr. Andrews's "left leg position as noted in the photograph [supplied by plaintiff's counsel] could have resulted" in the left hip fracture on the grounds that Dr. Bourgeois lacks the expertise to render a medical

causation opinion and his opinion is unreliable and irrelevant. The only issue for this Court to resolve[7] is whether the plaintiffs have submitted competent medical evidence that it is more probable than not that Mr. Andrews's injuries were caused by the ladder incident. They have not.

When medical causation issues are not within the common knowledge of a lay person, the test for proving the causal relationship between an accident and the subsequent injury is "whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident." Monsanto v. Goodyear Tire & Rubber Co., 650 So.2d

---

[7] In their opposition papers, the plaintiffs attempt to invoke a presumption dissolving their obligation to prove medical causation and even inaccurately characterize the record by suggesting that "[i]t is an uncontested fact that the accommodation ladder violated regulations regarding the rigging of a pilot ladder and failed to comply with applicable safety standards." The Pennsylvania Rule applies to transform this allegedly "uncontested" violation, the plaintiffs suggest, into a presumption that the violations caused Mr. Andrews's injury. This issue is not only inadequately briefed on the law, but the plaintiffs fail to persuade the Court that an uncontroverted factual predicate exists to apply the Pennsylvania Rule. The plaintiffs likewise fail to persuade the Court that it is necessary to indulge a presumption where, as here, "the parties have introduced evidence to dispel the mysteries that gave rise to the presumptions." In re Mid-South Towing Co., 418 F.3d 526, 531 (5th Cir. 2005). Because no party moves for or is entitled to judgment as a matter of law regarding the applicability of the Pennsylvania Rule here, the Court need not resolve whether it would apply.

14

757, 759 (La. 2/20/95); Chavers v. Travis, 902 So.2d 389, 394 (La.App. 4 Cir. 2005)(expert medical testimony is necessary, and lay testimony is insufficient, "when the conclusion regarding medical causation is not within common knowledge."). Here, the plaintiffs do not appear to dispute that determining whether an artificial hip fracture was caused by the normal progression or wear of an artificial hip or instead caused by a trauma presents complex legal and medical issues.

The medical evidence in the summary judgment record supports the defendants' causation theory, that is, that the plaintiff's hip surgery was not necessitated from a trauma he suffered in climbing the accommodation ladder, but, rather, caused by normal wear of his artificial hip. To create a genuine issue for trial and withstand summary judgment, the plaintiffs must submit competent admissible medical evidence that his hip surgery was caused by the injury he says he suffered climbing the accommodation ladder on the MAINE TRADER. In support of their causation theory, the plaintiffs submit an unsworn letter from a previously-deposed doctor, who states in conclusory fashion that Mr. Andrews's description of his leg position in climbing and maneuvering the ladder "could have resulted in fracture of the antero-superior aspect of the 'socket' of the left hip arthroplasty."

15

It is helpful to consider the record timeline leading up to Dr. Bourgeois's March 2017 letter "opinion." Taking the record in the light most favorable to Mr. Andrews:

- Mr. Andrews had hip replacement surgeries in 2009.

- Mr. Andrews scheduled an appointment with Dr. Millet at least a month before the alleged January 24 incident.

- On August 24, 2010, when Dr. Millet saw Mr. Andrews, x-rays showed that the acetabular component of the left hip replacement (the socket portion made up of a metal shell and a polyethylene liner) had some verticality to it. Dr. Millet was concerned about possible polyethylene wear.

- Mr. Andrews did not seek medical attention immediately following his piloting duty on the MAINE TRADER. Mr. Andrews appeared for his previously-scheduled appointment with Dr. Millet four days after he piloted the MAINE TRADER; there is nothing in the sign-in sheet or medical chart to suggest that Mr. Andrews's complaints regarding his hip were attributed to climbing the MAINE TRADER's accommodation ladder.

- Neither Dr. Watson nor Dr. Millet attribute Mr. Andrews's need for hip revision surgery to a specific incident; rather, both have opined that the left revision surgery he performed was necessary due to polyethylene wear.

16

- Dr. Bourgeois deferred to Dr. Millet's opinion on medical causation.

Now, the plaintiffs offer a new "opinion" by Dr. Bourgeois in an attempt to create a genuine dispute as to the material fact of medical causation. The Court need not consider whether this "opinion" should be excluded under the Federal Rules of Evidence, as urged by defendants, because the Court finds that it is inadmissible under Rule 56.[8]

Summary judgment procedure mandates that a statement or dispute of fact must be supported by materials in the record. Although "[a] formal affidavit is not required," Rule 56 still requires "a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit." See 2010 Advisory Committee Notes to Rule 56(c)(4). Here, in an attempt to support a fact on which they will bear the burden of proof at trial, the plaintiffs submit an unsworn letter by a doctor who previously offered testimony under oath during a deposition. The

---

[8] It is this Court's practice to consider motions to exclude expert testimony when such testimony is offered during trial, outside the jury's presence. The Court will not advise counsel as to the potential admissibility of Dr. Bourgeois's testimony where, as here, there is no competent summary judgment evidence in the record memorializing Dr. Bourgeois's purported opinion on medical causation.

17

plaintiffs fail to suggest how an unsworn letter directed to plaintiffs' counsel that is offered for the truth of the matters asserted could be presented in a form that would be admissible in evidence.[9] The unsworn letter is not admissible summary judgment evidence and the Court will disregard it.[10]

Thus, with no medical evidence suggesting that Mr. Andrews's latest hip surgery was prompted by his work on the MAINE TRANDER, absent from the record is a genuine dispute concerning medical causation. This case is distinguishable from those in which each party presents reasonable theories supported by admissible evidence of what caused the plaintiff's injury. Here, no medical doctor has concluded that Mr. Andrews's hip fracture was caused by trauma climbing the accommodation ladder.[11] The only evidence on

---

[9] Presumably, the plaintiffs will offer Dr. Bourgeois as a witness at trial, but the Court need not speculate. It is the obligation of counsel to comply with the clear summary judgment procedure. See Fed. R. Civ. P. 56(c)(2). Insofar as the plaintiffs expect the Court to consider incompetent and inadmissible summary judgment evidence as a mere placeholder for trial testimony, the Court declines. To indulge a wait-and-see approach would undermine the summary judgment process, which demands that the non-moving party do more than simply deny the allegations raised by the moving party.

[10] The plaintiffs, who have supplemented their opposition papers, have had ample opportunity to submit competent admissible evidence in support of their burden to prove medical causation.

[11] The Court observes that the proffered "opinion" that the incident "could have resulted" in the fracture of the artificial hip is rather equivocal. However, it is unnecessary (indeed, it would be advisory) for the Court to decide whether the proffered opinion,

medical causation are two doctors suggesting that the hip revision surgery was necessary due to wear and tear of the hip replacement and one doctor's (incidentally, Dr. Bourgeois's) testimony that he lacks sufficient information to render a medical causation opinion and therefore defers to Dr. Millet's opinion on medical causation. Because there is no medical expert opining that Mr. Andrews's left hip injury was, more likely than not, caused by the MAINE TRADER's accommodation ladder, the defendant has carried its summary judgment burden by showing its entitlement to relief based on a complete absence of record evidence to support the mandatory element of medical causation. Nothing submitted by plaintiff trumps the mandate of Rule 56 regarding a "genuine" dispute as to a "material fact."

Accordingly, for the foregoing reasons, IT IS ORDERED: that the defendants' motion for summary judgment and to exclude the medical causation opinion of Dr. Bourgeois is hereby GRANTED. Because the plaintiffs have failed to submit admissible evidence on an essential element of their claims, the defendants are entitled to judgment as a matter of law, and the plaintiffs' claims

---

if competent and admissible, would satisfy the plaintiff's preponderance burden, that is, whether the opinion is evidence that persuades the fact finder that the plaintiffs' claim is more likely true than not true.

are hereby dismissed.  All counsel should be mindful of 28 U.S.C. § 1927.[12]

New Orleans, Louisiana, June 19, 2017

                            _____
                                   MARTIN L.C. FELDMAN
                                   U.S. DISTRICT JUDGE

---

[12] The Court may not and has not made any credibility determinations in resolving the pending motion for summary judgment. Nevertheless, the Court is compelled to articulate its concern that one or more of the parties or witnesses to this case fails to appreciate the criminal consequences of lying under oath. Counsel should be aware that this Court will not hesitate to refer anyone suspected of perjury to the United States Attorney's Office and related agencies for investigation.